# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

JOHN PATE,

        Plaintiff,

-v-

METOKOTE CORPORATION, *et al.*,

        Defendants.

Case No. 3:11-cv-209

Judge Thomas M. Rose

---

**ENTRY AND ORDER GRANTING DEFENDANT ADECCO USA, INC.'S MOTION FOR SUMMARY JUDGMENT (ECF No. 35), DENYING PLAINTIFF'S MOTION TO STRIKE (ECF No. 49), AND TERMINATING CASE.**

---

Pending before the Court are Defendant Adecco USA, Inc.'s Motion for Summary Judgment (ECF No. 35) and Plaintiff's Motion to Strike Portion of Defendant Adecco USA, Inc.'s Reply in Support of Its Motion for Summary Judgment With Second Declaration of Brandy Bihn (ECF No. 49). Plaintiff John Pate asserts claims of age discrimination, retaliation, and uniformed service discrimination against Defendants, MetoKote Corporation and Adecco USA, Inc., under federal and Ohio state laws.[1] *See* First Am. Compl., ECF No. 17.

**I. Factual Background**

Plaintiff John Pate ("Pate") applied for employment with Defendant Adecco USA, Inc. ("Adecco"), a temporary staffing agency, on July 21, 2009. John Pate Dep. vol. 2, 281:22-24, Dec. 16, 2011, ECF No. 30 ("Pate Dep. vol. 2"). Shortly thereafter, Adecco hired Pate and placed him as a temporary worker at Defendant MetoKote Corporation ("MetoKote") on August 4, 2009. Pate Dep. vol. 2, 286:14-16; 288:12-15. Pate was assigned to the third shift as an

---

[1] Pate and MetoKote Corporation reached a settlement agreement on Counts I, II, III, IV, IX, and X; therefore, only the claims brought against Adecco USA, Inc. are before the Court.

unloader on production line number two at the MetoKote facility in Huber Heights, Ohio. Pate Dep. vol. 2, 294:25-296:9. As an unloader, Pate's primary responsibilities included taking parts off the line, loading them into plastic containers, and stacking the plastic containers. Pate Dep. vol. 2, 296:4-9.

During the summer of 2010, MetoKote managers Tim Lindsey ("Lindsey") and Suzy Bailey ("Bailey") compiled a list of temporary workers assigned at MetoKote who could potentially be hired as full-time employees. Lindsey Dep. 21:9-25, Mar. 26, 2012, ECF No. 46. Temporary workers were deemed eligible for full-time employment if they: (1) had worked at least 520 hours at MetoKote; (2) had a good attendance record; (3) had exhibited strong work performance; and (4) demonstrated a desire to become a full-time MetoKote employee. Lindsey Dep. 22:3-23:9. Pate was excluded from this list because the managers believed he had no desire to become a full-time MetoKote employee. Lindsey Dep. 24:6-9. Pate neither informed MetoKote's management that he wanted to be considered for full-time employment nor applied for any positions during his time as a temporary worker. John Pate Dep. vol. 1, 57:13-58:14, Dec. 15, 2011, ECF No. 29 ("Pate Dep. vol. 1"); Pate Dep. vol. 2, 314:10-24. Additionally, the managers assumed that Pate's disparaging remarks about MetoKote and the way the company was run demonstrated that he had no interest in becoming a full-time employee. Pate Dep. vol. 1, 41:12-42:5; Rutledge Dep. 13:4-15; 17:19-22, Mar. 26, 2012, ECF No. 45.

In early January 2011, Pate began suspecting that MetoKote was engaged in age discrimination because he was almost 41 years old and had not been offered a full-time position. Pate Dep. vol. 2, 352:16-21. When MetoKote recognized 24-year-old Saudiq Rutledge ("Rutledge") for his one year of service at an employee meeting, Pate realized that he and the younger employee had both joined MetoKote as temporary workers around the same time, yet

only Rutledge had received an offer of full-time employment. Pate Dep. vol. 1, 69:22-71:56; Pate Dep. vol. 2, 342:2-343:3; Rutledge Dep. 6:13-25. Subsequently, Pate reviewed MetoKote's October 2010 quarterly newsletter, which contained a photograph of employees hired in August and September 2010, and began asking fellow employees about their ages and lengths of time spent as temporary workers prior to being hired on full-time. Pate Dep. vol. 1, 69:22-70:1; Pate Dep. vol. 2, 342:2-13; 344:25-347:21; Pate Dep. Ex. 21, ECF No. 30-1. Based on his questioning, Pate concluded that the new hires were all in their 20s and had only worked for MetoKote for five to six months on average. Pate Dep. vol. 1, 68:6-13; 70:17-71:5. Since Pate was about to turn 41 and had been a temporary worker at MetoKote for eighteen months, he concluded that age discrimination must be taking place. Pate Dep. vol. 1, 71:3-5. However, MetoKote hired thirteen former temporary workers during Pate's time with the company and five of those hires were over the age of 40. Saylor Aff. ¶¶ 7-8, ECF. No. 36-13. Furthermore, the temporary workers over age 40 had worked an average of 12.5 months before their date of hire, whereas the employees under age 40 had worked an average of 18 months. Saylor Aff. ¶ 9. Pate then drafted a letter to MetoKote voicing his concerns about age discrimination and indicating his intention to file an EEOC complaint. *See* Pate Dep. Ex. 6, ECF No. 29-1.

On January 14, 2011, Brandy Bihn ("Bihn"), Adecco's on-site Client Program Supervisor for MetoKote at the time, received a text message indicating that Pate intended to resign from his MetoKote assignment effective the following Friday, January 21, 2011. Bihn Dep. 15:2-4, Mar. 6, 2012, ECF No. 31; Bihn Decl. ¶¶ 2, 8, ECF No. 35-2. After receiving the text message, Bihn reported Pate's resignation to MetoKote management. Bihn Dep. 21:1-6; Lindsey Dep. 30:11-19; Bailey Dep. 36:12-21, Mar. 6, 2012, ECF No. 41. While Adecco's standard operating procedures also required that the Custom Match database be updated contemporaneously to

maintain information on their temporary employees, Bihn did not make an entry about Pate's resignation on January 14, 2011.  Bihn Dep. 61:6-17; Bihn Dep. Ex. 27, ECF No. 31-1.  Bihn's Custom Match entry regarding Pate's resignation was not entered until January 20, 2011, which she claims may have been due to the period of time when she was without her computer.  Bihn Dep. 109:2-23; Bihn Dep. Ex. 27.  Aside from Bihn, numerous MetoKote employees indicated that Pate mentioned he had given notice because he was going back to school.  *See* Pate Dep. vol. 2, 248:17-19; Bailey Dep. 8:21-9:6; 10:7-21; Blossom Dep. 22:21-25; 24:24-25:2, Mar. 7, 2012, ECF No. 44; Coover Dep. 15:12-16:11, Mar. 7, 2012, ECF No. 42.  Though Pate had initially applied to attend Sinclair Community College ("Sinclair") in April 2010, his enrollment was delayed while he waited to receive his GI Bill benefits for his two tours as a logistics supply specialist in the United States Army from 1987 to 1992 and 1996 to 1999.  Pate Dep. vol. 1, 18:22-19:16; 22:19-22; 25:22-26:10; Pate Dep. vol. 2, 248:9-11; 276:10-13; Pate Dep. Ex. 15, ECF No. 29-1; *see also* First Am. Compl. ¶ 9.  Pate ultimately enrolled in Sinclair and began taking classes during the Spring Quarter in 2011; however, he denies ever texting Bihn and asserts that he did not resign from his position with MetoKote.  Pate Dep. vol. 1, 71:17-19; 102:16-25; Pate Dep. vol. 2, 252:4-8; 319:7-14.

On January 17, 2011, at approximately 2:00pm, Pate went to the Adecco office in Huber Heights and spoke with Adecco's branch manager, Amanda Maurer ("Maurer"), about the letter he planned to send MetoKote.  Pate Dep. vol. 1, 81:10-13; 85:1-16.  Pate told Maurer that he believed MetoKote was discriminating against temporary employees on the basis of their age and hiring the younger workers for full-time positions more quickly.  Maurer Dep. 15:20-16:1, Mar. 6, 2012, ECF No. 32.  Maurer then assured Pate that his concerns would be investigated and asked him not to send the letter to MetoKote until he heard back from her.  Pate Dep. vol. 1,

85:17-21. At that time, Maurer called Dee Saylor ("Saylor"), MetoKote's Human Resources and Administration Manager for the Huber Heights facility, and notified her of Pate's concerns so that an investigation could be conducted. Saylor Dep. 44:19-45:7, Mar. 7, 2012, ECF No. 34; Saylor Aff. ¶ 2.

Later in the afternoon on January 17, 2011, MetoKote's Saylor called Adecco's Bihn to confirm that Pate had given notice of his resignation and asked that he be released from the remainder of his assignment. Bihn Dep. 28:23-29:22; Saylor Dep. 50:19-51:2. According to Saylor, MetoKote typically releases temporary workers who give notice of their resignation prior to the end of their notice period because such temporary workers often quit showing up for their remaining shifts and it hurts production. Saylor Dep. 51:12-52:11; Bihn Dep. 96:6-10; Lindsey Dep. 52:19-22; Bailey Dep. 13:16-19. Consistent with his regular work schedule and the observance of Martin Luther King, Jr. Day, Pate's first scheduled shift after Bihn received the resignation text message was for that night, January 17, 2011. Pate Dep. vol. 1, 78:19-79:3; Pate Dep. vol. 2, 295:20-296:3. At approximately 4:30pm on January 17, 2011, Bihn called Pate and told him that he did not need to report back to his assignment at MetoKote. Bihn Dep. 31:17-32:13; Pate Dep. vol. 1, 77:18-24. Instead, Adecco replaced Pate with another temporary worker named Michael Russell, who was older than Pate and 46 years old at the time. Bihn Decl. ¶ 10.

Pate still drove to the MetoKote facility on the evening of January 17, 2011, to return his safety glasses and to leave some documents for Bihn, including the letter to MetoKote regarding its purported age discrimination. Pate Dep. vol. 1, 96:22-98:10. Upon arriving, Pate spoke with Aaron Coover ("Coover"), a MetoKote manager, who informed him that he needed to leave the premises. Pate Dep. vol. 1, 97:3-17. The next day, Saylor called the Huber Heights police department about obtaining a "no trespass" order to keep Pate off of MetoKote's property.

Saylor Dep. 64:10-19.  Shortly thereafter, Joan Gross ("Gross"), an Adecco Employee Relations Specialist, explained to Pate that he had not been terminated, but rather resigned from his assignment at MetoKote, and therefore could still call Adecco on a weekly basis if he wanted a new assignment.  Gross Dep. 15:7-18:10, Mar. 14, 2012, ECF No. 33.  Pate never called Adecco and did not receive any additional assignments as a result.  Pate Dep. vol. 1, 106:21-107:19; Bihn Decl. ¶ 17.

Pate later filed this action asserting claims of age discrimination, retaliation, and uniformed service discrimination against both MetoKote and Adecco under federal and Ohio state laws.  Because Pate and MetoKote settled their claims, the Court only addresses the claims brought against Adecco in Counts V, VI, VII, VIII, XI, and XII.  The Court has federal question jurisdiction over Counts V, VII, and XI under 28 U.S.C. § 1331, and supplemental jurisdiction over Counts VI, VIII, and XII, under 28 U.S.C. § 1367(a).

## II. Analysis

### A. Plaintiff's Motion to Strike

Pate is seeking to strike the Second Declaration Under Penalty of Perjury Pursuant to 28 U.S.C. § 1746 of Brandy Bihn (ECF No. 47-1) and all references to that document in Defendant Adecco USA, Inc.'s Reply Memorandum (ECF No. 47).  Pate argues that the contents and references to Ms. Bihn's Second Declaration must be stricken because they are impertinent and were produced in contravention of the letter and spirit of the rules of discovery.  Pl.'s Mot. Strike 4, ECF No. 49.  Pate specifically asserts that Ms. Bihn's Second Declaration should have been produced in response to his request for production of documents two days prior to the close of discovery and that Adecco's production of documents one month later did not suffice.

### 1. Legal Standard

Under *Federal Rule of Civil Procedure 12(f)*, "court[s] may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Though the rule only applies on its face to pleadings, courts may also strike other materials using their inherent power to control their dockets. *Zep Inc. v. Midwest Motor Supply Co.*, 726 F. Supp. 2d 818, 822 (S.D. Ohio 2010) (citing *Anthony v. BTR Auto. Sealing Sys.*, 339 F.3d 506, 516 (6th Cir. 2003)). However, motions to strike are generally disfavored and should only be granted when the material at issue has "no possible relation to the controversy." *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953).

Neither Ms. Bihn's Second Declaration nor the references to it in Defendant Adecco USA, Inc.'s Reply Memorandum constitute pleadings; therefore, the Motion to Strike will only be granted at the Court's discretion in order to control the docket. *See* Fed. R. Civ. P. 7(a).

**2. Material to Be Stricken**

Though Pate places significant weight on Adecco's use of Bihn's Second Declaration, Adecco only referenced the document once. Defendant Adecco USA, Inc.'s Reply Memorandum referred to Bihn's Second Declaration in a single footnote stating:

> The absence of written documentation of Pate's resignation during a time when Bihn was without a computer and had no reason to suspect that his resignation would turn into a disputed issue does not create an issue of material fact sufficient to avoid summary judgment. Bihn clearly documented Pate's resignation and there is no credible evidence to dispute that her timing was for any reason other than documented problems with her computer. (Bihn 2nd Decl. ¶¶ 4-5, Exh. A, B)

Reply Mem. Supp. Def. Adecco's Mot. Summ. J. 3, n.4, ECF No. 47. Contrary to Pate's assertion, the contents and single reference to Bihn's Second Declaration are not impertinent and were not produced in contravention of the letter and spirit of the rules of discovery.

Only materials "that do not pertain or are not necessary to the issues in question" are considered impertinent. *New Day Farms v. Bd. of Tr.*, No. 2:08-cv-1107, 2009 U.S. Dist. LEXIS

130429, at *8 (S.D. Ohio June 10, 2009) (citing 5C Wright & Miller Federal Practice & Procedure §1382 (3d ed. 2009)).  Under Pate's claims of employment discrimination and retaliation, any information connected to the end of his employment would be relevant.  Since the information contained in Bihn's Second Declaration and the aforementioned footnote within Defendant Adecco USA, Inc.'s Reply Memorandum both address the documentation of Pate's resignation, the information is not impertinent, but rather clearly related to the case at hand.  Therefore, such information should not be stricken.

Admittedly, Bihn's Second Declaration was not produced within the formal discovery period; however, it was not "in contravention of the letter and spirit of the rules of discovery" as Pate suggests either.  Pl.'s Mot. Strike 4.  Pate did not serve his Second Set of Requests for the Production of Documents to Defendant Adecco USA, Inc. until March 14, 2012, only two days before the discovery deadline.  Considering that the Preliminary Pretrial Conference Order (ECF No. 11) explicitly required that all discovery be concluded, as opposed to requested, by the discovery deadline of March 16, 2012, Adecco had no technical obligation to respond to Pate's untimely request.  However, as part of its ongoing discovery obligations, Adecco's letter dated April 16, 2012, provided Pate with copies of the two documents that would ultimately be filed with Bihn's Second Declaration as Exhibits A and B.  *See* Butler Decl. Ex. 2, ECF No. 49-1.

Despite the fact that the discovery deadline had already passed, Pate accuses Adecco of gamesmanship because they failed to respond to all of his document requests.  While true that "our system of discovery was designed to increase the likelihood that justice will be served in each case, not to promote principles of gamesmanship and deception," Adecco's actions here were not deceptive.  *Abrahamsen v. Trans-State Express*, 92 F.3d 425, 428 (6th Cir. 1996).  Adecco complied with the formal discovery deadlines and then turned over further substantive

documents as part of its ongoing discovery obligations.  *See* Butler Decl. Ex. 2.  Pate cannot claim that he was "being materially harmed by the untimely production and cannot gather information necessary to rebut new claims in Adecco's Reply Memorandum," when he received the exact same substantive documents back on April 17, 2012, and also obtained copies of Bihn's first declaration and deposition through formal discovery.  Pl.'s Mot. Strike 5; Reply Mem. Supp. Def. Adecco's Mot. Summ. J. 3; Butler Decl. Ex. 2.  Though Pate indicates that discovery is not meant to be an exercise in gamesmanship, he "waited nearly five months after the close of discovery, four months after the production of the documents, and two months after the submission of the challenged declaration" before pursuing this argument.  Def. Adecco's Mem. Opp'n Pl.'s Mot. Strike 2, ECF No. 50.  If the untimely production did in fact materially harm Pate, he should have raised the issue sooner.

Accordingly, Plaintiff's Motion to Strike Portion of Defendant Adecco USA Inc.'s Reply in Support of Its Motion for Summary Judgment with Second Declaration of Brandy Bihn (ECF No. 49) is **DENIED**.

**B. Defendant's Motion for Summary Judgment**

**1. Legal Standard**

Pursuant to *Federal Rule of Civil Procedure 56(a)*, "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Ultimately, the Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The moving party bears the initial burden of proving the basis for its motion and identifying "the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits" that show there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995).

In determining whether a genuine issue of material fact exists, the Court must view the record and all of its reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the Court cannot weigh the evidence or try to determine the truth of any matter in dispute. *Anderson*, 477 U.S. at 249. Therefore, summary judgment shall be denied when there are "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992).

## 2. Age Discrimination Claims

Pate brought claims of age discrimination under the Age Discrimination in Employment Act ("ADEA") and Ohio state law. Counts V and VI allege that Adecco "either knew or had reason to know that MetoKote was using a discriminatory qualification standard and failed to take corrective action within its control." First Am. Compl. ¶¶ 51, 58.

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). ADEA claims may be proven by direct or circumstantial evidence. If the plaintiff presents direct evidence, then he must prove that age was the "but-for" cause of the alleged

employment decision. *Geiger v. Tower Auto.*, 579 F.3d 614, 621 (6th Cir. 2009). In contrast, when the plaintiff relies on circumstantial evidence, the *McDonnell Douglas* burden-shifting analysis is followed, which first requires that the plaintiff establish a *prima facie* case. *Geiger*, 579 F.3d at 622. In order to establish a *prima facie* case of age discrimination, the plaintiff must show: "(1) he is over the age of forty; (2) he applied for a job for which he was qualified; (3) he was not selected for the position; and (4) a significantly younger individual was selected." *Benn v. Peake*, No. 1:07-cv-854, 2010 U.S. Dist. LEXIS 140929, at *9 (S.D. Ohio Dec. 27, 2010) (citing *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 311-312 (1996)). Once this *prima facie* case is established, the burden then shifts to the employer to "articulate a non-discriminatory reason for its action." *Burzynski v. Cohen*, 264 F.3d 611, 622 (6th Cir. 2001). The plaintiff then has the ultimate burden of proving "that the defendant's proffered reason was a pretext for age discrimination." *Id.*; *see also Barnett v. Dep't of Veterans Affairs*, 153 F.3d 338, 341 (6th Cir. 1998).

This matter does not get past the plaintiff's initial burden of establishing a *prima facie* case because Pate does not fulfill the second element. It is undisputed that Pate never applied for a full-time, permanent employee position with MetoKote. Pate Dep. vol. 1, 57:13-24. As a general principle, "one cannot establish that he was subject to an adverse hiring decision unless he makes his desire for the position known to the employer." *Wanger v. G.A. Gray Co.*, 872 F.2d 142, 147 (6th Cir. 1989). Under a failure to hire theory, "the requirement that an age discrimination plaintiff apply for the job is grounded in common sense. For if an application were not necessary, then nearly every decision to hire or promote would be subject to challenge." *Id.* (quoting *Reilly v. Friedman's Express, Inc.*, 556 F. Supp. 618, 623 (M.D. Pa. 1983)). Considering that it is undisputed that Pate never applied for a full-time position or explicitly

informed MetoKote or Adecco management that he sought permanent employment, Pate does not prove the second element and cannot establish a *prima facie* case for age discrimination. Additionally, without any indication from Pate that he wanted a full-time position with MetoKote, Adecco had no reason to even suspect that MetoKote was using a discriminatory qualification standard to offer temporary employees full-time positions. This is especially true because the record is devoid of any temporary employees prior to Pate raising such concerns with Adecco management. Even when viewing the record in the light most favorable to Pate, he cannot make out a *prima facie* case of age discrimination; therefore, Adecco could not have known or even had reason to know that MetoKote made age-based employment decisions prior to Pate's discussion with Adecco's branch manager, Maurer, on January 17, 2011. *See* Pate Dep. vol. 1, 81:10-13; 85:1-16.

Furthermore, Adecco did not "fail[] to take corrective action within its control" once it became aware of Pate's concerns. First Am. Compl. ¶¶ 51, 58. After Pate informed Maurer on January 17, 2011, that he believed MetoKote was discriminating against temporary employees on the basis of their age and hiring younger workers for full-time positions more quickly, Maurer took action. Maurer Dep. 15:20-16:1. That same day, Maurer called Saylor, MetoKote's Human Resources and Administration Manager for the Huber Heights facility, so that an investigation into Pate's claims could be conducted. Saylor Dep. 44:19-45:7; Saylor Aff. ¶ 2. Regardless of whether or not MetoKote actually engaged in age discrimination, Adecco began looking into the accusation immediately upon hearing Pate's concerns and cannot be held liable.

Ohio state law similarly prohibits age-based discrimination under Ohio Rev. Code § 4112.02(A). Since the Supreme Court of Ohio also adopted the *McDonnell Douglas* framework for age discrimination claims brought under Chapter 4112 of the Ohio Revised Code, Pate's state

claims must also fail.  *See Kowach v. Ohio Presbyterian Ret. Servs.*, 2010 Ohio 4428, P22 (2010); *see also Barker v. Scovill, Inc.*, 451 N.E.2d 807, 809 (Ohio 1983).

Without establishing a *prima facie* case, Pate's ADEA and associated state law claims must fail as a matter of law.  Pate even concedes that his ADEA claims lack merit and he does not oppose summary judgment with respect to these particular claims.  *See* Pl.'s Mem. Opp'n Def. Adecco USA, Inc.'s Mot. Summ. J. 1, ECF No. 38.  As a result, Adecco is entitled to summary judgment on Pate's age discrimination claims.

The Court **GRANTS** Defendant Adecco USA, Inc.'s Motion for Summary Judgment (ECF No. 35) as to Counts V and VI.

**3. Retaliation Claims**

Pate also brought claims of retaliation under the ADEA and Ohio state law.  Counts VII and VIII allege that Adecco retaliated against Pate for opposing MetoKote's age discrimination policies by failing to take corrective action against MetoKote when it knew about those policies and by refusing to offer Pate temporary employment with another client.  First Am. Compl. ¶¶ 62, 63, 64, 68, 69, 70.

The ADEA prohibits an employer from discriminating against an employee because he "has opposed any practice made unlawful by [§ 623] or because . . . [he] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation." 29 U.S.C. § 623(d).  ADEA retaliation claims based on circumstantial evidence also follow the *McDonnell Douglas* burden-shifting analysis.  *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010).  Under this framework, "Plaintiff has the initial burden to establish a *prima facie* case of retaliation under the ADEA by establishing that: (1) he engaged in protected activity when he made his age discrimination complaint; (2) Defendant knew about his exercise

of the protected activity; (3) Defendant thereafter took adverse employment action against him; and (4) there was a causal connection between the protected activity and the adverse employment action." *Id.* at 491-92 (citing *Fox v. Eagle Distrib. Co., Inc.*, 510 F.3d 587, 591 (6th Cir. 2007)). If a *prima facie* case is established, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *See Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 320 (6th Cir. 2007). Then the final burden rests on the plaintiff who must prove that the offered non-discriminatory reason was merely pretext for actual retaliation. *Id*.

These claims do not get past the *prima facie* stage because Pate cannot prove that Adecco took any adverse employment action against him for opposing MetoKote's discriminatory employment practices. In fact, the record provides no evidence that Adecco even knew that Pate suspected age discrimination until his discussion with Adecco's branch manager, Maurer, on the afternoon of January 17, 2011. *See* Pate Dep. vol. 1, 81:10-13; 85:1-16. Furthermore, that discussion took place days after Bihn received the text message indicating Pate's resignation from his position with MetoKote. Bihn Dep. 15:2-4; Bihn Decl. ¶¶ 2, 8, 12-15. Even though the Court must accept as true Pate's testimony that he never personally sent a resignation text message to Bihn on January 14, 2011, that does not dispute Adecco's honest belief that he had resigned from his position with MetoKote. As a result, Adecco reasonably acquiesced to MetoKote's request that Pate be replaced with another temporary worker because of the history of temporary workers who resign and subsequently fail to show up for their remaining shifts, not for a retaliatory purpose. Bihn Dep. 96:6-10; Lindsey Dep. 52:19-22; Bailey Dep. 13:18-19.

Moreover, Pate's replacement was an adverse employment action specifically requested by MetoKote, not a unilateral decision by Adecco. Regardless of the issues with MetoKote, Pate remained an Adecco employee and was eligible to obtain other placements at his request;

therefore, Pate cannot prove that Adecco refused to offer him temporary employment with another client. Under Adecco's general placement policies, employees are expected to call in on a weekly basis to see if any assignments are available. Bihn Decl. ¶ 6. Such weekly calls verify that the employee is still seeking a temporary placement and allows Adecco to give them priority when an opening becomes available. Bihn Dep. 75:22-76:10. However, it is undisputed that Pate never called Adecco for a new placement after January 17, 2011. Pate Dep. vol. 1, 106:21-107:19. Even after Gross, an Adecco Employee Relations Specialist, discussed the MetoKote situation with Pate and explicitly told him that he could still call Adecco on a weekly basis if he wanted a new assignment, Pate made no such calls. Gross Dep. 15:7-18:10. Adecco did not refuse to place Pate with another client as Pate contends; rather, Pate did not receive any additional assignments because he never called in. *See* Bihn Decl. ¶ 17.

Much like the ADEA, Ohio state law makes it unlawful "to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice . . . or because that person has made a charge, testified, assisted, or participated in any manner in [a related] investigation, proceeding, or hearing." Ohio Rev. Code § 4112.02(I). Considering that retaliation claims brought pursuant to Ohio Revised Code Chapter 4112 are also analyzed under the *McDonnell Douglas* framework, Pate's state law claims must also fail. *See Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 544 (6th Cir. 2008).

The Court **GRANTS** Defendant Defendant Adecco USA, Inc.'s Motion for Summary Judgment (ECF No. 35) as to Counts VII and VIII.

### 4. Uniformed Service Discrimination Claims

Additionally, Pate alleged uniformed service discrimination under the Uniformed Services Employment and Reemployment Rights Act ("USERRA") and Ohio state law. Pate

bases these claims on his service as a logistics supply specialist in the United States Army from 1987 to 1992 and 1996 to 1999, which Pate asserts partially motivated MetoKote's decision to seek the "no trespass" order. First Am. Compl. ¶¶ 9, 20, 89. Counts XI and XII allege that "Adecco either knew or had reason to know that MetoKote was using a discriminatory qualification standard and failed to take corrective action within its control." First Am. Compl. ¶¶ 91, 98.

Under USERRA, anyone "who . . . has performed . . . in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that . . . performance of service." 38 U.S.C. § 4311(a). Therefore, an employer's actions violate USERRA, if an employee's service "is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such . . . service." 38 U.S.C. § 4311(c).

When bringing a USERRA claim, the employee has the "initial burden of establishing a *prima facie* case of discrimination, 'the employer then has the opportunity to come forward with evidence to show, by a preponderance of the evidence, that the employer would have taken the adverse action anyway, for a valid reason.'" *Hance v. Norfolk S. Ry. Co.*, 571 F.3d 511, 518 (6th Cir. 2009) (quoting *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1013 (Fed. Cir. 2001)). *Prima facie* uniformed service discrimination can be proven through direct or circumstantial evidence that "the defendant relied on, took into account, considered or conditioned its decision" on an employee's military status. *Petty v. Metro. Gov't of Nashville-Davidson Cnty.*, 538 F.3d 431, 446 (6th Cir. 2008) (quoting *Coffman v. Chugach Support Servs.,* 411 F.3d 1231, 1238 (11th Cir. 2005)).

Pate's USERRA claims clearly fail as a matter of law because he provides no evidence of an adverse employment action connected to his prior military service. By definition, an adverse employment action is a "materially adverse change in the terms and conditions of *employment*." *Smith v. City of Salem*, 378 F.3d 566, 575-76 (6th Cir. 2004) (quoting *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999)) (emphasis added). Accordingly, adverse employment actions "include firing, failing to promote, reassignment with significantly different responsibilities, a material loss of benefits, suspensions, and other indices unique to a particular situation" involving a specific individual's employment. *Id*. at 575-76 (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). However, Pate's uniformed service claims were based solely on actions taken by MetoKote after he was no longer assigned as their temporary worker. *See* Pate Dep. vol. 2, 367:2-368:3. Therefore, MetoKote's call to the police for a "no trespass" order that prevented Pate from returning to the property did not qualify as an employment action and is an improper basis for a USERRA claim.

Similarly, Ohio state law prohibits discrimination based on "military status." Ohio Rev. Code § 4112.02(A). Given that § 4112.02(A) deals specifically with employment decisions, Pate's state law claims must also fail as a matter of law.

Since Pate provides no further evidence of uniformed service discrimination, there is no adverse employment action and thereby no *prima facie* case. However, even if the "no trespass" order could establish a uniformed service discrimination claim against MetoKote, Adecco cannot be held liable for MetoKote's unilateral security measures. As a temporary staffing agency, Adecco merely provides MetoKote with temporary workers and is not involved in any decisions regarding daily operations at the Huber Heights facility. Even Pate concedes that his USERRA claims lack merit and he does not oppose summary judgment on these claims. *See* Pl.'s Mem.

Opp'n Def. Adecco USA, Inc.'s Mot. Summ. J. 1.  As a result, Adecco is entitled to summary judgment on Pate's uniformed service discrimination claims.

The Court **GRANTS** Defendant Adecco USA, Inc.'s Motion for Summary Judgment (ECF No. 35) as to Counts XI and XII.

**IV. Conclusion**

For the foregoing reasons, Plaintiff's Motion to Strike Portion of Defendant Adecco USA Inc.'s Reply in Support of Its Motion for Summary Judgment with Second Declaration of Brandy Bihn (ECF No. 49) is **DENIED** and Defendant Adecco USA, Inc.'s Motion for Summary Judgment (ECF No. 35) is **GRANTED**.  Summary judgment having been awarded on all claims, the captioned case is hereby **TERMINATED** upon the docket records of the United States District Court for the Southern District of Ohio, Western Division at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio this Tuesday, November 13, 2012.[2]

                                                  **s/Thomas M. Rose**
                                                  _____
                                                  THOMAS M. ROSE
                                               UNITED STATES DISTRICT JUDGE

---

[2] The Court acknowledges the valuable contribution and assistance of judicial extern Catherine Tatum in drafting this opinion.